THE DENVER AND RIO GRANDE RAILROAD COMPANY v. NYE.

1. RAILROADS—NEGLIGENCE—FENCES.
The fact that the right of way of a railroad company was inclosed by lawful fences does not constitute a defense to an action against the company for negligently killing live stock thereon. :

2. PRACTICE.
Error cannot be predicated upon the remarks of counsel to the jury when it appears that such remarks were stopped by the trial court as soon as its attention was called thereto.

3. INSTRUCTIONS.
Instructions requested which are only elaborations of propositions plainly stated in others given may be properly refused.

4. PRACTICE—DISCRETION.
The submission of special questions to be answered by the jury rests in the discretion of the trial court.

*Appeal from the District Court of Montrose County.*

APPELLEE brought suit to recover the value of two horses alleged to have been killed, or so injured as to necessitate the killing of them, by an engine on the road of appellant. The value was alleged to have been $250. The killing was charged with being by the negligence of the company in operating the engine.

Defendant answered, denying the allegations of the complaint, and for a second defense pleaded the following :

" That plaintiff negligently permitted the horses in said complaint mentioned to run and be upon the right of way of defendant, and knowingly allowed them to remain thereon, and on defendant's track at such a point and in such a way that defendant's servant, in the running and management of

its locomotive and cars, could not by the exercise of due care have prevented such injury, and that such injury complained of was caused by and through such negligent acts of plaintiff, and while the defendant was in the exercise of due care in the operation of its locomotive and cars."

There was a further special defense, which was stricken out upon demurrer. An exception was taken to the judgment of the court. Trial was had to a jury. Verdict and judgment for the plaintiff for $250.

Messrs. WOLCOTT & VAILE and Mr. W. W. FIELD, for appellant.

Messrs. BLACK & CATLIN, for appellee.

REED, P. J., delivered the opinion of the court.

There was no conflict of testimony in regard to the value of the animals; nor was there any in regard to the injuries having been inflicted by the engine. It is shown that the injury occurred at a point where the road for some distance was enclosed by a substantial wire fence. At a point one fourth of a mile from where the collision occurred there was an opening or gate that had been left open. Through this opening the herd of horses, eight or ten in number, entered from the common or range, and were grazing on the inclosed right of way of appellant.

The circumstances attending the accident can be better understood from the evidence of Mr. Trusdale for appellee, and Mr. Layton, the engineer, sworn for appellant. The evidence of the former was: "I was perhaps four or five hundred yards from the railroad. The train was coming south or up the road, and I noticed some horses on the railroad; I don't remember how many; I never counted them, but I saw the horses on the road; heard the engine whistle some distance below; not at the horses, but before they came into the switch. I looked up and I saw the horses on the track or right

close to it, and I stopped right where I was and watched them to see how the train would get through · them ; I supposed there might be a chance for an accident. The train came along up the road; they were not running at any very great rate of speed, or I didn't think they were. They didn't whistle when they came anywheres near where the horses were. The horses didn't appear to be frightened; kept eating along and walking along the side of the road, or on the road, until the train got almost among them, and all at once they got excited and started to run, some across the road and on the road. They run across; they seemed to be on the east side, or northeast side, rather, of the track, and they crossed the road to the west or southwest side, I believe it is; and afterwards only two of them seemed to be hurt to amount to anything, a gray horse and a bay mare; and after the train passed through among them they didn't whistle, ring the bell or anything. I supposed they were trying to slip through among the horses quietly as possible not to create any excitement. After they got through among the horses I seen some of them were hurt pretty badly, limped, and we had some horses of our own out and I went out to see whose horses they were. I didn't know whose horses they were when I got there, but found two of them to be considerably hurt. Some of them run through the wire fence and were scratched up a little, but not much hurt."

Mr. Layton, the engineer, testified: " I was coming east on No. 6, engine No. 175, passenger train, and as I got in sight of Menoken I saw some horses inside the fence; saw them a good long ways. I supposed that if I would keep still I could pass by them without causing them to get on the track, so I run up without making any noise of any kind, only the natural noise of the engine and train, thinking I could slip by them; but before I got to them they started to run this way—east we call it; then I didn't like to ease up, as I thought if I did possibly they would get ahead of me and try to cross over; so I thought that I would try to go a little faster to head them off—that is, to beat their speed; but

before I got quite to the horses, they took a sudden notion they wanted to cross the track, and then I didn't have time to do anything only try to stop, as there's a little bridge ahead, and I knew I was going to get them into the bridge; I applied the brakes and I think I reversed the engine, and about that time the accident was over; I reversed the engine again, put off the brakes and went on. I struck the horses near the bridge; they were not on the track when I first saw them; they were close to the fence; I don't know how far the fence is; it is quite a distance from the track; sometimes it is close to the track and sometimes further, but it is a good ways; I couldn't tell; probably a hundred feet—maybe more or less. I didn't notice what they were doing; I saw them there and my object was to let them stay there if possible and go by them; I got in a hundred feet of them, possibly, before they started to run. This bridge was probably a hundred yards from the end of the switch where the fence crosses the east end. It was my object to slip by them without disturbing them. When they started they run east or south along the line of the fence close to the fence as far as I could see, until the engine obstructed my view; it would obstruct my view when I got the engine between me and the horses. The fireman I think told me, 'Look at them—they are going to cross;' and I then tried to stop as I was afraid to get them in the bridge, as it would probably cause a wreck or something else. I didn't want to hit them in the bridge, nor anywhere else. I know I tried to stop. They crossed over until they got to the fence on the other side, and then ran up along that fence until the fence turned them into the cattle guard this way, and I expected possibly they were so excited they would run into the cattle guard, and I had the train under full control expecting them to do so; but they didn't. They run up to the guard and turned and jumped the fence. There were six or eight of them. Q. Did you notice how many of them, if any, were hurt? A. Yes; there was one I reported left on the track—knocked it down and left it there; it was a bay; I couldn't tell much about it; I don't remember anything of any.

gray knocked down there. The only thing I know of was the bay animal. There was a gray that got fastened on the fence, and I was by some time before he got loose; I couldn't tell just how he got fastened; I don't know anything about it; I saw the horses try to jump over, and they all did get over pretty well but this one, and he got fastened; he got very near through, and got in here and hung there for some time. They jumped the fence on the right side. They were on my left coming this way when I first saw them. After they started to cross the track it wasn't possible for me to stop the train. The fill where I first saw them was about two feet; that would be my judgment. I might possibly exceed that a little; I don't know." And upon cross-examination: "When I first saw the horses I was very nearly three-quarters of a mile from them; I was running about thirty miles an hour at the time I entered the switch. After I saw the horses begin to run I increased my speed; they were possibly a hundred feet ahead of me when they began to run; they were over a quarter of a mile from the north end of the switch when they began to run; probably a hundred yards from the east end; they were at the fence to my left, one hundred feet ahead of the engine."

There having been no conflict in the evidence in regard to the facts and circumstances of the accident, we are relieved of the necessity of discussing it. The question of negligence was one of fact to be determined by the jury. The finding was against appellant. Whether the course pursued by the engineer was prudent or reckless can only be determined by those more familiar with the management of trains than I am. The testimony of the engineer clearly shows an admitted error in judgment. The view was not obstructed. He saw the horses three fourths of a mile,— were known to be within the fences on either side. What, under the circumstances, a band of horses would do, could not be anticipated. Not knowing what they would do, it seems that common prudence would require that in any attempt to pass them the train should be "slowed down" and.

under perfect control, so it could at once be stopped in case the horses should attempt, as they did, to cross ahead of the engine.

The evidence shows such lack of control that after the horses got upon the track they ran for some distance, in advance, until a bridge was encountered, before the collision occurred, showing that the train was not so handled as to render the accident unavoidable. Whether through error of judgment or recklessness, the result was the same, and it was fortunate that there was not a loss of human, as well as animal, life. The conditions were such that the engineer should not have tried an experiment.

The defense of the right of way being fenced with a lawful fence was properly rejected. Whether rightfully or wrongfully there, they were there, seen by the engineer a long distance, and it was his duty, so far as was possible, to prevent a collision or injury. Hence proof in regard to a right of way, fenced with strong fences, would have presented no defense.

It is assigned as error that the court permitted plaintiff's attorney in his argument to the jury to make improper and irrelevant statements and arguments for the purpose of prejudicing the jury against the defendant. What occurred in this respect was as follows: " Counsel for defendant excepts to counsel for the plaintiff stating in his argument to the jury that the defendant expects nothing before this jury, but are proceeding with the case, as is their practice, with a view of taking the case to a higher court." The court: " What was done in reference to other cases is not proper; but counsel may comment upon the course of the defendant in this case." Counsel for defendant excepts to the ruling of the court, and asks that the record contain the statements of counsel, the statements referred to being in substance as follows: By Mr. Black: " The defendant can have but one object, and that is to annoy and harass this plaintiff and make the prosecution of this case so expensive that the very idea will defeat him, overwhelm him, subdue him, drive him

home, and compel him to suffer any injury rather than come into court and ask for damages. They don't expect anything in this case before this jury. They have simply laid the foundation to take the case to a higher court, where with the aid of a fifty thousand dollar library, and the counsel of the United States senator, they may defeat justice."

It appears that the language used by the attorney preceded the very proper ruling and caution of the court, and that line of argument appears to have stopped there. The practice in such cases is well settled. Considerable latitude within the limits of the case is allowed an attorney. When he oversteps the line of professional practice and drags in extraneous matter for the purpose of creating prejudice, or in any way exceeds professional limits, and opposing counsel objects, it becomes the duty of the court to stop it. If he fails to do so, and the objectionable argument is continued, it is error. As shown by the bill of exceptions, it was stopped as soon as the court's attention was called to it; consequently no error could be predicated upon it.

The instructions given, five in number, including the one as to the form of a verdict, were each excepted to and errors assigned. The first two were in regard to facts about which there was no controversy. The third and fourth were important as to the questions of negligence and liability. I give them in full:

" You are, therefore, instructed that the first and principal question for you to determine is whether or not the defendant company, through its servants operating said locomotive, so negligently managed and operated the same and the train of cars attached thereto that the said horses were run into and against thereby ; for inasmuch as the defendant company was duly apprised of the proximity of said stock to the track where its said locomotive and train would pass, it was its duty to exercise reasonable and ordinary care, skill and diligence to prevent the same running into and against said horses. In law, negligence is defined to be the want of that care and prudence which a person of ordinary intelligence would exercise under all the circumstances of the case ; so

that if you should find and believe from the evidence that the defendant company was guilty of negligence in the operation of its said locomotive and trains, that the damage to said horses, by running against the same, was the natural, ordinary result of such negligence, and the proximate cause of the injury to said animals by said locomotive striking them as aforesaid, which a reasonable, prudent and cautious person ought to have apprehended would result from so running and operating said locomotive and train, then plaintiff would be entitled to recover; otherwise not. In establishing these facts the burden of proof rests with the plaintiff to prove the same by a preponderance of the evidence in the case." Excepted to by defendant.

"4. In the event you find the plaintiff entitled to recover, then you are instructed that the amount of such recovery would be the difference between the reasonable value of said horses just prior to the injury, and the value thereof as injured, and on this question of damages you are further instructed that the burden of proof rests with the plaintiff to establish the amount of said damages by a preponderance of evidence in the case, and likewise establish that said horses were injured by said locomotive or train running against or upon the same; for any injury to said stock caused by running against, into, or attempting to jump the fence along said right of way, or injury in any way caused other than being run into or against by said locomotive or train, though caused by fright at the speed or noise thereof, or the escape of steam or smoke from said locomotive and the noise occasioned thereby, defendant would not be responsible for, no matter in what manner it might have been operating its locomotive and train aforesaid."

They are full, carefully worded, and seem to fairly state the law of the case. I do not see that they are in any way open to criticism.

The following instruction was given upon the request of the defendant:

"You are further instructed on the question of negligence, that if you believe from the evidence that the engineman

running the engine in question saw said horses while several hundred yards away and used his best judgment to get by said horses without frightening them, and that after they became so frightened he used his best judgment in operating his train or engine so as to avoid any injury or damage, and to avoid striking said horses, and that his judgment and acts were such as would have been employed by a reasonable, prudent man and engineman under like circumstances, and that notwithstanding this, said stock was struck and injured, still such acts of said engineman would not constitute such negligence as to render defendant liable herein."

The instructions given are as favorable to the defendant as the facts established would warrant.

The instructions offered by the defendant were refused, exceptions taken and errors assigned. The same in effect had been given. Those offered only elaborated the propositions previously plainly stated, and were very properly refused.

Five questions were propounded by defendant's counsel for special findings by the jury and refused by the court. Such refusal is assigned for error. It was a matter in the discretion of the court, and the exercise of such discretion is not subject to review, unless there was an evident and apparent abuse of it. The refusal of the court was warranted. The three first questions were: 1st. Was there negligence? 2d. If so, in what did it consist? 3d. Was the gray horse injured by a collision with the engine or by the wire fence? It will at once be seen that without a determination of these questions by the jury, upon the instructions of the court no verdict could have been found. They were the factors and the only ones, and the answer was, of necessity, embraced in the general verdict. The answers to the other two, if given, would have been of no legal importance;—were whether the horses' legs were broken, etc. Both might have been answered in the negative and yet not influence the general finding. We find no serious error, and the judgment of the district court will be affirmed.

*Affirmed.*